'08 CIV 7047

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE VALIDATION GROUP, INC., D/B/A
STELEX-THE VALIDATION GROUP AND
F/K/A STELEX INC.
Two Greenwood Square
3331 Street Road, Suite 300
Bensalem, PA 19020

CIVIL ACTION NO.

                  Plaintiff,

**COMPLAINT**

v.

CLARK, RICHARDSON & BISKUP
CONSULTING ENGINEERS, INC., A/K/A
AND/OR D/B/A CRB CONSULTING
ENGINEERS, INC.
7410 N.W. Tiffany Springs Parkway
Suite 100
Kansas City, MO 64153

JURY TRIAL DEMANDED

                  Defendant.

AUG 07 2008
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff The Validation Group, Inc., d/b/a Stelex-The Validation Group and f/k/a Stelex

Inc., by and through its attorneys, White and Williams LLP, complains of and demands judgment

against Defendant Clark, Richardson & Biskup Consulting Engineers, Inc., a/k/a and/or d/b/a

CRB Consulting Engineers, Inc., as follows:

## PARTIES

1.      Plaintiff The Validation Group, Inc., d/b/a Stelex-The Validation Group and f/k/a

Stelex Inc. ("Stelex"), is a corporation duly organized under the laws of the State of New Jersey,

with its principal place of business in Bensalem, Pennsylvania.

2.      On information and belief, Defendant Clark, Richardson & Biskup Consulting Engineers, Inc., a/k/a and/or d/b/a CRB Consulting Engineers, Inc. ("CRB") is a corporation organized under the laws of the State of Missouri, with its principal place of business in Kansas City, Missouri.

## JURISDICTION AND VENUE

3.      This Honorable Court has original jurisdiction of this action pursuant to 28 U.S.C. §1332(a)(1), as the matter involves a controversy between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4.      Venue is proper in this District pursuant to the agreements at issue, as the parties have agreed that this judicial district is the exclusive federal district in which this action may be brought.

## STATEMENT OF FACTS

5.      Stelex and CRB entered into an agreement titled "Pfizer Kalamazoo/Holland Sub-Consultant Agreement for Engineering Services," dated August 23, 2004 and accepted by Stelex on August 31, 2004 (the "Sub-Consultant Agreement," attached hereto as Exhibit A), under which Stelex provided professional services for various projects that CRB performed for Pfizer, Inc. ("Pfizer").

6.      Under the Sub-Consultant Agreement, CRB and Stelex jointly developed and submitted proposals to Pfizer to bid on various projects.

7.      The parties agreed that the Sub-Consultant Agreement would be subject to CRB's Multiple Project Service Agreement #2004-2783, dated April 1, 2004 between CRB and Pfizer (the "Multiple Project Service Agreement," attached hereto as Exhibit B).

8.      Under the Multiple Project Service Agreement, CRB was responsible for the timely completion of work done for Pfizer, and, without additional compensation, was to correct or revise any errors, omissions or deficiencies in such work.

9.      In June of 2006, CRB and Stelex jointly submitted a proposal to bid on the Pfizer "Convenia Transfer Project" (the "Convenia Proposal"), a project that involved transferring equipment from a facility in Pennsylvania and engineering and designing a renovated facility in Kalamazoo, Michigan, where certain antibiotic pharmaceutical products for animals would be manufactured, as well as commissioning and qualification ("C&Q") services for the pharmaceutical equipment and systems.

10.     Stelex submitted a proposal to CRB for the C&Q Services on June 14, 2006, and based on changes requested by Pfizer, resubmitted a proposal on July 5, 2006 (the July 5, 2006 proposal shall be referred to herein as the "Stelex C&Q Proposal").

11.     Under the Stelex C&Q Proposal, Stelex estimated the amount of time and cost for its C&Q services based on the schedule provided by Pfizer; any additional work was to extend the time and cost of the Convenia Transfer Project.

12.     CRB and Stelex were awarded the Convenia Transfer Project; CRB was to be responsible for engineering and design, while Stelex was to be responsible for certain C&Q services.

13.     Stelex performed services that were in addition to those reflected in the estimate in the Convenia Proposal.

14.     Various adjustments and change orders for this additional work done by Stelex were approved by Pfizer.  Some of the change orders were agreed in writing.  Other change orders were agreed to orally and/or by virtue of Pfizer's and/or CRB's knowledge that Stelex

was performing extra work and investing additional time, and their acceptance of the benefits of that extra work and time.

15.     On information and belief, some of the services performed by Stelex that were in addition to the estimate in the Convenia Proposal had to be done as a result of CRB's inefficiencies and/or failure to perform needed engineering and design services.

16.     On information and belief, CRB performed and was compensated for work outside the scope of its estimate in the Convenia Proposal.

17.     Stelex is owed $634,724.48 for services it performed on the Convenia Transfer Project that were in addition to the estimate in the Convenia Proposal.  Despite demand by Stelex, CRB has failed and refused to pay this sum to Stelex.

18.     CRB is responsible for this amount due Stelex.

## COUNT I – BREACH OF CONTRACT

19.     Stelex incorporates by reference Paragraphs 1 through 18 inclusive, as though fully set forth herein at length.

20.     Under the Sub-Consultant Agreement and the Multiple Project Service Agreement, Stelex is entitled to payment from CRB for the services it performed in addition to the estimate in the Convenia Proposal.

21.     To date, CRB has failed to pay the outstanding amount of $634,724.48 due to Stelex.

Wherefore, Stelex demands that judgment be entered in its favor and against CRB in the amount of $634,724.48, plus interest and costs and reasonable attorneys' fees as allowed by law, and such further relief as this Court may deem just and proper.

## COUNT II – QUANTUM MERUIT

22.     Stelex incorporates by reference Paragraphs 1 through 21 inclusive, as though fully set forth herein at length.

23.     Stelex performed the C&Q services in good faith.

24.     CRB accepted those services rendered by Stelex for the Convenia Transfer Project.

25.     Stelex had an expectation of compensation in exchange for the services rendered and performed.

26.     Stelex is entitled to the reasonable value of the services provided and performed.

27.     CRB is responsible for payment to Stelex for these services.

Wherefore, Stelex demands judgment be entered in its favor and against CRB in the amount of $634,724.48, plus interest and costs and reasonable attorneys' fees as allowed by law, and such further relief as this Court may deem just and proper.

## COUNT III – UNJUST ENRICHMENT

28.     Stelex incorporates by reference Paragraphs 1 through 27 inclusive, as though fully set forth herein at length.

29.     Stelex expected remuneration from CRB at the time it performed the C&Q services and at the time it conferred the benefit on CRB, and CRB received the benefit under circumstances by which it expected or should have expected to compensate Stelex.

30.     CRB, a consultant for Pfizer, received the benefit, in the form of the value of the work completed by Stelex.

31.     The retention of such benefit by CRB without compensation to Stelex yields an unjust result.

32.     The failure of CRB to compensate Stelex for the work performed on the Convenia Transfer Project enriched CRB beyond its contractual rights.

Wherefore, Stelex demands that judgment be entered in its favor and against CRB in the amount of $634,724.48, plus interest and costs and reasonable attorneys' fees as allowed by law, and such further relief as this Court may deem just and proper.

## JURY DEMAND

Stelex hereby demands a trial by jury as to all issues so triable.


Dated: August 7, 2008                    Respectfully submitted,
                                         **WHITE AND WILLIAMS LLP**
                                         *Attorneys for Plaintiff, The Validation Group, Inc.,*
                                         *d/b/a Stelex-The Validation Group*

                                         By: *Rafael Vergara*
                                         Rafael Vergara (RV-4098)
                                         One Penn Plaza, Suite 1801
                                         New York, NY 10019
                                         Phone: (212) 244-9500
                                         Fax: (212) 631-4436
                                         E-mail: vergarar@whiteandwilliams.com


                                         OF COUNSEL:
                                         Peter J. Mooney
                                         Edward T. Fisher
                                         WHITE AND WILLIAMS LLP
                                         1800 One Liberty Place
                                         Philadelphia, PA  19103
                                         *Attorneys for Plaintiff, The Validation*
                                         *Group, Inc., d/b/a Stelex-The Validation*
                                         *Group*
                                         (215) 864-7164/6310

PHLDMS1 4493361v.1



**C L A R K**
**R I C H A R D S O N  &**
**B I S K U P**
**CONSULTING ENGINEERS, INC.**

5250 LOVERS LANE
SUITE 130
KALAMAZOO, MI 49002
PHONE (269) 342-9474
FAX (269) 342-9560
www.crbusa.com

August 23, 2004

Mr. Jamie Koehler
Stelex, Inc.
47 West Division St., Suite 349
Chicago, IL 60610

Re: **Pfizer Kalamazoo / Holland Sub-Consultant Agreement for Engineering Services**

Dear Jamie:

Clark Richardson & Biskup Consulting Engineers, Inc., (CRB) has been awarded a **Multiple Project Service Agreement** for the Pfizer Kalamazoo and Holland, MI sites. We are pleased to issue this Agreement to award portions of the design work for various projects to Stelex, Inc. (Subconsultant). Following is our current understanding of our Agreement.

Subconsultant will be responsible for providing professional services. The Subconsultant scopes of work, completion schedule and fees for the services will be provided to CRB for inclusion in jointly developed proposals to Pfizer. Fee basis will vary depending on requests for proposals and project requirements issued by Pfizer (i.e. lump sum, hourly not-to-exceed, etc.).

The scope of services or work under this Agreement may be modified for additional or revised services or work with approved change orders in writing. Subconsultant will provide exclusive services under CRB's Service Agreement with Pfizer unless otherwise agreed to by CRB.

This Agreement is subject to CRB's *Multiple Project Service Agreement* #2004-2783 dated April 1, 2004, which currently binds CRB to Pfizer, Inc., and extends until March 31, 2007, following which this Agreement may be renewed by CRB and Subconsultant by mutual consent. Subconsultant will perform services for CRB in accordance with all provisions of the *Multiple Project Service Agreement*. Attached is a copy of the final Agreement with the non-applicable portions deleted. This agreement does not guarantee Subconsultant work.

CRB expects the work to be executed on the Pfizer Kalamazoo site or at the Subconsultant's offices, unless otherwise arranged by CRB.

RALEIGH                    ST. LOUIS                    KANSAS CITY                    PHILADELPHIA

August 23, 2004
Mr. Jamie Koehler

In addition to the *Multiple Project Service Agreement* requirements, the following conditions apply:

**Insurance**:  Subconsultant will supply CRB with a Certificate of Insurance based on the insurance limits called out in the terms and conditions with Pfizer and CRB named as additional insureds.

**Terms of Payment**:  Subconsultant will be paid on a "pay when paid" basis within 15 days of receipt of payments from Pfizer, Inc.

Please call me if you have any questions.  We look forward to a successful relationship with your firm and outstanding projects for Pfizer.  Thank you for your participation.

Please sign and return a copy of this document if you agree with the contents.

Sincerely,

**Clark, Richardson & Biskup**

A. Grady Vaughan, PE
Associate

Agreed for Stelex, Inc.:

Signed

Title     *VP*

Date     *8-31-04*

Encl:  *Multiple Project Service Agreement #2004-2783*

Page 2 of 2

# MULTIPLE PROJECT SERVICE AGREEMENT #2004-2783

This Master Services Agreement (this "Agreement") is made as of this 1st day of April, 2004 (the "Effective Date") by and between CRB Consulting Engineers Inc., having an address of 7410 N.W. Tiffany Springs Pkwy., Suite 100 Kansas City, MO 64153 ("Provider") and Pfizer Inc., having an address of 235 East 42nd Street, New York, NY 10017-5755 ("Owner") and any of its Affiliates (as defined below) that is a party to the Project Supplement (as defined below).

## 1.    Definitions

"Affiliate" shall mean any corporation, firm, partnership or other entity, which directly or indirectly controls, is controlled by or is under common control with Provider or Owner. For purposes of this definition, "control" shall be presumed to exist if one of the following conditions is met: (a) in the case of corporate entities, direct or indirect ownership of at least fifty percent (50%) of the stock or shares having the right to vote for the election of directors, and (b) in the case of non-corporate entities, direct or indirect ownership of at least fifty percent (50%) of the equity interest with the power to direct the management and policies of such non-corporate entities.

"Confidential Information" shall mean all proprietary information, trade secrets, businesses, pharmaceuticals, testing and research operations, processes, methods, strategies and systems, environmental and financial information, prices, materials, building techniques and any other information or data, or any fact with respect to any of the foregoing matters relating to this Agreement and/or any Project Supplement, whether disclosed in oral, graphic, written or any other form, disclosed to Provider or its Consultants by or on behalf of Owner, or developed by Provider or its Consultants on behalf of Owner. Confidential Information includes, without limitation, the terms and conditions of this Agreement. Confidential Information shall not include information which are: (i) known to Provider or its Consultants which have been reduced to writing prior to disclosure by Owner and that are not subject to another obligation of secrecy; (ii) hereafter lawfully obtained from other sources on a non-confidential basis; or (iii) otherwise generally available to the public.

"Consultant" shall mean any agent, representative, subcontractor, consultant, advisor or other third party employed or used by Provider in the performance of the Services.

"Jobsite" shall mean the location(s) where the Services are performed with respect to a Scope of Work.

"Project Supplement" shall mean a supplement and/or a purchase order issued pursuant to this Agreement as required by Owner to be agreed by the Parties from time to time containing at a minimum descriptions and specifications of the project or the work to be performed under this Agreement, the pricing, the schedule, and, if applicable, a list of approved reimbursable expenses and a list of approved Provider's consultants.

"Scope of Work" shall mean the descriptions and specifications of the work contained in the applicable Project Supplement.

"Services" shall mean the obligations of Provider, its Affiliates and its Consultants contemplated by this Agreement and any Project Supplement.

"Party" shall mean Provider or its Affiliates that is a party to any Project Supplement, on the one hand, and Owner or its Affiliates that is a party to any Project Supplement, on the other hand.

"Work Product" shall mean any designs, design analyses, diagrams, plans, devices, techniques, developments, inventions, information, object or source code, drawings, estimates, specifications, calculations, field notes, manuals, reports, renderings, documentation and any other deliverable conceived, developed, authored, produced or acquired by Provider, its Affiliates or its Consultants, either alone or in concert with others, for Owner pursuant to this Agreement or any Project Supplement.

## 2.    Incorporation of Terms

**2.1    Project Supplement Required.**  This Agreement serves as the master agreement for all design and engineering projects and other services (except construction services) between the Parties, and requires that a Project Supplement be agreed by the Parties prior to commencement of any Services specified in any Scope of Work. The terms and conditions of this Agreement shall apply to any and all Project Supplements.  Any amendment to the terms of this Agreement contained in a Project Supplement shall be effective solely to such Project Supplement, and not to this Agreement or any other Project Supplement.  Any amendment to the terms of this Agreement contained in an amendment to this Agreement shall be effective for all Project Supplements.

**2.2    No Guarantee of Work.**  Notwithstanding anything in this Agreement to the contrary, until the Parties have executed and delivered a Project Supplement with respect to a Scope of Work, nothing in this Agreement shall be construed as Owner engaging Provider for any services or work. Provider acknowledges that the execution and delivery of this Agreement does not entitle Provider to any work from the Owner or its Affiliates.

## 3.    Provider's Responsibilities

**3.1    Provider to Control.**  Provider shall have the complete professional, managerial and technical responsibility for the validity, accuracy, and reliability of the Services and the Work Product, whether such Services and Work Product are performed by employees of Provider, its Affiliates or its Consultants.  Review, acceptance and/or approval by Owner of the Work Product shall not relieve Provider of the obligation to complete the entire Scope of Work in strict compliance with the requirements of this Agreement and the applicable Project Supplement.

**3.2    Provider to Correct Errors.**  Provider shall be responsible for the professional quality, technical accuracy and timely completion of the Services and the Work Product.  Provider shall, without additional compensation, and at its own cost and expense, promptly correct or revise

any errors, omissions or other deficiencies in the Services and/or the Work Product.

3.3 **Provider to Designate Manager.** Provider shall designate a manager in charge of the entire Scope of Work on a continuous basis with responsibility for providing adequate supervision or direction and having authority to take all action that may be required in performance of the applicable Project Supplement. Provider shall not remove or reassign its manager in charge of the Scope of Work or its other key personnel designated in the Project Supplement without the prior written approval of Owner, unless such personnel is no longer employed by Provider.

3.4 **Removal of Provider's Personnel.** Provider shall immediately remove from the Scope of Work any of its or its Consultant's personnel designated by Owner. Provider shall hold harmless Owner on account of such action.

3.5 **Location of Services.** The Services shall be performed at locations satisfactory to Owner and such locations shall not be changed without approval of Owner. Owner shall have access at all times to the locations where Services are being performed and to all of the Work Product.

3.6 **Safety.** Provider shall be responsible for the health and safety of its employees and the employees of its Consultants, if any, while present at the Jobsite and other locations where Services are performed. Provider shall comply with all applicable laws, rules and regulations relating to health and safety. Whenever Provider has any employees at the Jobsite, either temporarily on visits or on assigned basis, Provider shall comply with all of the regulations and directives of Owner with respect to safety, security, entrances, parking areas, sanitation, and other provisions for maintenance of good order.

4. **Owner's Responsibilities**

4.1 **Owner's Representative.** Owner shall designate in writing a person to act as Owner's representative who shall have the authority to transmit instructions, receive information, interpret and define Owner's policies and make decisions and in general to act as liaison between Owner and Provider relating to this Agreement. In addition, in each Project Supplement, Owner shall designate its representative who shall act as a liaison between Owner and Provider relating to such Project Supplement.

4.2 **Access.** Owner shall arrange for Provider, its agents and representatives to have access to the Project site at reasonable times.

5. **Payments**

5.1 **Progress Payments.** Progress payments shall be made by Owner to Provider at the intervals specified in the applicable Project Supplement. In consideration of the "time and material" services to be furnished by Provider, Owner shall pay Provider per Exhibit B, Fee Schedule, attached hereto and incorporated herein by reference. When Services are performed on a "fixed price" basis, Owner shall pay Provider in accordance with the payment terms

identified in the respective Project Supplement. All progress payments are funds to be applied by Provider to payment for labor, materials, equipment, services, and supplies for the Scope of Work. With each request for progress payment, Provider shall submit proper evidence, including affidavits and certificates as may be requested by Owner showing (i) the portion of the Scope of Work authorized and satisfactorily completed, (ii) compliance with all requirements of this Agreement and the applicable Project Supplement, (iii) payment of bills and (iv) that no lien or security interests exist or could be claimed arising from such Scope of Work, including from each Consultant, and partial waivers of lien and releases of Owner for Services performed to the date of Provider's invoice. Providers request shall, at minimum, adhere to the requirements of Exhibit D hereto.

5.2     **Retainage.** Owner may withhold progress payments when specified in the applicable Project Supplement equivalent to ten percent (10%) of the amount earned, or the maximum amount allowed by applicable laws if such amount is less than ten percent (10%), as retainage, until final completion and acceptance of the Services and, in addition may withhold such amounts as may be reasonably required to assure compliance by Provider with the terms of this Agreement and applicable Project Supplement. Owner may pay directly an actual obligation of Provider arising under this Agreement or applicable Project Supplement and withhold such payment from amounts otherwise due to Provider. Provider shall submit with its request for final payment similar evidence and a release of further claim for payment against Owner, as well as final waivers of lien and releases of Owner from each Consultant, material vendor and other parties directly or indirectly involved in the applicable Project Supplement.

5.3     **Payment of Retainage.** Upon completion and acceptance by Owner of all Services required or specified under this Agreement and applicable Project Supplement, including without limitation delivery of all Work Product and other required forms, releases and documents to Owner, the retainage and any other amount due Provider under this Agreement and applicable Project Supplement shall be paid by Owner.

6.     **Changes**

6.1     **Changes by Owner; Adjustments Due to Changes.** Owner or its Affiliate may, from time to time, by written order, and without invalidating this Agreement or Project Supplement, or any portion thereof, make changes in the Scope of Work, or the conditions under which Services are to be performed, or may increase or decrease the Services to be performed. No change shall be made by Provider in the Scope of Work or its manner of performance without prior written authorization or instructions from Owner or its Affiliate, specifying the details of the change, and specifying whether there is to be an adjustment in the price or time for performance. Upon receipt of written instructions from Owner or its Affiliate specifying the changes in the Scope of Work, Provider shall immediately proceed with the performance of the Services, as changed. If

- 4 -

such changes increase or decrease either the cost or time required to perform the Services, then the applicable Parties will mutually agree to an equitable adjustment to the price and/or the time to perform the Services.

**6.2     Changes to be in Writing.**  Any change to the Scope of Work shall be in writing, shall define the extent of the change, the price or basis of pricing the change, the impact of the change on the schedule, and shall be signed by the applicable Parties. No additional work by the Provider shall be paid for unless authorized in advance, in writing, by Owner or its Affiliate.

**6.3     Reduction in Scope of Work.**  In the event of deletion or reduction of the Scope of Work by such change, Provider shall not be entitled to any special, indirect, incidental or consequential damages, including without limitation contribution to lost profits or unabsorbed overhead as a result of any portion of the Scope of Work not performed.

## 7.     <u>Representations and Warranties</u>

**7.1     Provider's Representations and Warranties**

Provider represents and warrants to Owner that:

**(a)     Performance Standards**

Provider shall perform, and shall cause its Consultants to perform, all of its obligations under this Agreement: (i) in strict accordance with the terms of this Agreement and the applicable Project Supplement, including all amendments, work orders and other related documents; and (ii) in a professional, commercially diligent basis, in accordance with the generally accepted industry and professional standards, procedures and practices, to the reasonable satisfaction of Owner.

**(b)     Qualifications of Provider's Personnel**

All individuals performing Services on behalf of Provider shall be well qualified to perform such Services, and Provider's personnel shall have, and Provider shall cause its Consultant's personnel to have, all professional licenses, permits, certificates and registrations required for their performance of the Services.

**(c)     Compliance with Laws**

Provider shall comply, and shall cause its Consultants to comply, with all applicable international, supranational, national, state, provincial, regional and local laws, ordinances, codes, rules and regulations.  Provider shall have all professional licenses, permits, certificates and registrations required for its performance of the Services.

**(d)     Work Product**

- 5-

All Work Product shall be in strict accordance with the specifications set forth in the applicable Project Supplement and shall not infringe upon the patent, copyright or other intellectual property rights of any third party.

**(e)** **Materials, Machinery and Equipment**

In the event Provider furnishes any materials, machinery and equipment under this Agreement or any Project Supplement, such materials, machinery and equipment (i) shall be new, unless otherwise agreed in writing in advance by Owner; (ii) shall conform with the specifications and requirements of this Agreement and the applicable Project Supplement, including all amendments, work orders and other related documents; (iii) shall comply with all applicable international, supranational, national, state, provincial, regional and local laws, ordinances, codes, rules and regulations including, without limitation, all such laws, ordinances, codes, rules and regulations regarding safety and health and all OSHA requirements; (iv) shall be of good quality and free of fault, damage or defects in materials, design and workmanship; (v) shall be merchantable and, in the event that Provider knows or has reason to know the purpose for which Owner intends to use any such materials, machinery and equipment, shall be fit and suitable for the purpose intended; and (vi) shall not infringe upon any patent, trademark, copyright or other intellectual property rights of any third party.

Provider has good title to all materials, machinery and equipment furnished under this Agreement and passes such title to Owner free of any security interests, liens, or other encumbrances.

Provider's warranties are in addition to any warranties provided by any third party manufacturers or suppliers of any materials, machinery or equipment furnished under this Agreement. Provider hereby assigns and transfers to Owner all such third party warranties; however, such assignment and transfer shall not relieve Provider of any of its warranty obligations herein.

**(f)** **Conflicts**

The execution, delivery and performance of this Agreement by Provider does not conflict with any agreement, instrument or understanding, oral or written, to which it is a party or by which it may be bound, and does not violate any law or regulation of any court, governmental body or administrative or other agency having authority over Provider. Provider is not currently a party to, and during the term of this Agreement will not enter into, any agreements, oral or written, that are inconsistent with its obligations under this Agreement or any Project Supplement.

- 6 -

(g)    **Authority**

Provider is validly existing and in good standing under the laws of the jurisdiction of its organization and has the power and authority to enter into this Agreement.  This Agreement has been duly executed and delivered by Provider and constitutes the valid and binding obligation of Provider, enforceable against it in accordance with its terms except as enforceability may be limited by bankruptcy, fraudulent conveyance, insolvency, reorganization, moratorium and other laws relating to or affecting creditors' rights generally and by general equitable principles.  The execution, delivery and performance of this Agreement have been duly authorized by all necessary action on the part of Provider, its officers and directors.

(h)    **Debarment**

Provider is not debarred by any applicable authority, including without limitation under subsections 306(a) or (b) of the Federal Food, Drug, and Cosmetic Act (as amended, the "Act") and Provider has not and will not use in any capacity the services of any person or entity who has been debarred by any applicable authority with respect to Services.  Provider will immediately notify Owner in the event that Provider, its Consultants or any of its or their employees becomes debarred or excluded during the term of this Agreement.  Provider acknowledges that such debarment shall be grounds for termination of this Agreement and any or all Project Supplements by Owner for cause.

(i)    **No Financial Change**

There has been no material adverse change in Provider's financial condition from the Effective Date or Provider's most recent year-end financial information submitted to Owner, whichever is later.  In the event Provider becomes aware of any material adverse change in its financial condition, Provider shall immediately notify Owner of such change.

(j)    **No Actions Pending**

There is no action, suit or proceeding, at law or in equity, before or by any court or governmental authority, pending or, to the best of Provider's knowledge, threatened against Provider, wherein an unfavorable decision, ruling or filing would materially adversely affect the performance by Provider of its obligations hereunder or the other transactions contemplated hereby, or which, in any way, would adversely affect the enforceability of this Agreement, or any other agreement or instrument entered into by Provider in connection with the transactions contemplated hereby.  In the event Provider becomes aware of such action, suit or proceeding, Provider shall immediately notify Owner.

-7-

7.2     **Owner Representations and Warranties**

Owner represents and warrants to Provider that:

(a)     **Conflicts**

The execution, delivery and performance of this Agreement by Owner does not conflict with any agreement, instrument or understanding, oral or written, to which it is a party or by which it may be bound, and does not violate any law or regulation of any court, governmental body or administrative or other agency having authority over it.  Owner is not currently a party to, and during the term of this Agreement will not enter into, any agreements, oral or written, that are inconsistent with its obligations under this Agreement or any Project Supplement.

(b)     **Authority**

Owner is validly existing and in good standing under the laws of the jurisdiction of its organization and has the power and authority to enter into this Agreement.  This Agreement has been duly executed and delivered by Owner and constitutes the valid and binding obligation of Owner, enforceable against it in accordance with its terms except as enforceability may be limited by bankruptcy, fraudulent conveyance, insolvency, reorganization, moratorium and other laws relating to or affecting creditors' rights generally and by general equitable principles.  The execution, delivery and performance of this Agreement have been duly authorized by all necessary action on the part of Owner, its officers and directors.

8.     **Proprietary Rights**

8.1     **Owner's Materials.**  All drawings, specification, designs and other data of any nature furnished by Owner to Provider for the performance of the Services may be used by Provider only in connection with its performance of the Services and shall remain the property of Owner.  Owner shall retain all rights, title and interest in and to such materials, including, without limitation, patents, copyrights and other intellectual property rights in any ideas, concepts, designs, inventions, and expressions embodied in such materials.

8.2     **Work Product.**  All Work Product shall be the exclusive property of Owner.  All Work Product shall be considered "Work Made For Hire" as defined in §101 (1) of the 1976 Copyright Act, and all rights, title and interest in and to such Work Product is and shall be transferred to and vested in Owner without any additional compensation to Provider, its Consultants or its or their employees.  In the event that any Work Product does not qualify to be Work Made For Hire, Provider hereby irrevocably transfers, assigns and conveys, and shall cause its Consultants to

- 8 -

irrevocably transfer, assign and convey, all rights, title and interest in and to such Work Product to Owner free and clear of any encumbrances, and Provider agrees to execute, and shall cause its Consultants to execute, all documents necessary to do so. All such assignments shall include, but are not limited to, existing or prospective copyrights and patent rights in any country.

8.3     **Pre-Existing Materials.** In producing Work Product pursuant to this Agreement, before using any materials in which Provider or any third party has pre-existing proprietary rights, Provider shall obtain the prior written consent of Owner, and Provider hereby grants to Owner, in the case of Provider pre-existing property rights, or shall obtain for Owner, in the case of third party pre-existing property rights, an unrestricted, royalty-free, irrevocable, world-wide, non-exclusive right to use, disclose, reproduce, modify, license or distribute such materials. Such rights shall extend to Owner's present and future Affiliates, successors and assigns.

9.     <u>**Insurance Requirements**</u>

9.1     Prior to the commencement of any Services under this Agreement or any Project Supplement, Provider shall provide and maintain such insurance coverage, in minimum types and amounts as described below in this Section, as will protect it and Owner (including Owner's Affiliates, its and their employees, directors, officers, shareholders and agents) from all claims which may arise out of or result from Provider's performance under this Agreement and any Project Supplement, whether such operations be by itself or by its Consultants or by anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable. Provider will permit no Consultant to enter the Jobsite or continue the performance of any Services unless such Consultant is and remains insured, as outlined in Section 9.2 below.

(a)     Any and all deductibles for such insurance policies shall be assumed by, for the account of, and at Provider's sole risk. All deductibles and self-insured retention amounts must be acceptable to and approved, in writing (if required), by Owner.

(b)     Such insurance policies shall be primary and non-contributing with respect to any other similar insurance policies available to Owner or its Affiliates. Except for Workers Compensation/Employers' Liability and Professional Liability/Errors & Omissions insurance, all such policies shall include Owner and its Affiliates and any other such entities as Owner may reasonably request, as additional insureds. All such polices shall provide a waiver of subrogation in favor of Owner and its Affiliates.

(c)     Provider shall furnish to Owner original certificates and additional insurance endorsements evidencing the specified insurance coverage, prior to beginning any Scope of Work, and, at contract renewal or expiration of any one coverage, whichever occurs first. If requested by Owner, copies of the insurance policies, themselves will be provided. Such certificates shall provide that not less than

- 9 -

thirty (30) days' prior written notice of any policy cancellation, or material change shall be given to Owner. The Certificate(s) of Insurance shall be signed by a person authorized by the insurer(s) to bind coverage on its (their) behalf. Provider shall provide, pay for, and maintain in effect the policies with minimum "A" A.M. Bests rated insurance carriers, or insurance companies satisfactory to Owner. Coverage shall be maintained for the duration of the Scope of Work until final completion or as specified below, whichever is longer.

9.2     The insurance required under Section 9.1 above shall be written for not less than any limits of liability specified herein or as required by law, whichever is greater. Provider shall have the right to provide the total limits required by any combination of primary and Umbrella/Excess coverage; said insurance to include, without limitation, the following:

(a)     Insurance for liability under the Workers' Compensation or occupational disease laws of any state or other jurisdiction in which the Services are performed (or be a qualified self-insurer in those states and jurisdictions) or otherwise applicable with respect to persons performing the Services and Employer's Liability insurance covering all claims by or in respect to the employees of Provider and all Consultants, providing:

(i).     Coverage for the statutory limits of all claims under the applicable State Workers' Compensation Act or Acts. If the Scope of Work will result in exposures under the U.S. Longshoreman's Act and its amendments (work dockside or on water), the Jones Act (involving seaman, masters and crew of vessels) or the Federal Employer's Liability Act (railroad exposure), coverage shall be extended to include insurance coverages mandated thereby;

(ii).     Employer's Liability Insurance with a limit of not less than $1,000,000;

(iii).     Voluntary Compensation insurance covering all employees not subject to the applicable state Workers' Compensation Act or Acts.

(b)     Commercial General Liability insurance with the following limits and forms/endorsements:

| | |
|---|---|
| Each Occurrence | $1,000,000 |
| Completed Operations Aggregate | $2,000,000 |

(i).     Occurrence form including premises and operations coverage, completed operations, broad form property

- 10-

damage, coverage for independent contractors, personal injury coverage, blanket contractual liability, explosion, collapse, and underground ("XCU") and watercraft liability coverage if the Scope of Work is on or near a body of water.

**(ii).** Completed operations coverage shall be maintained for a period of three (3) years following the date that the Scope of Work is completed and accepted.

**(iii).** ISO Endorsement CG20101185 including Owner and its Affiliates as additional insureds with respect to any legal liability of Owner or its Affiliates, arising out of the Services.

**(c)** Automobile and Truck Liability Insurance: $1,000,000 combined single limit for bodily injury and property damage arising out of all owned, non-owned and hired vehicles. This must cover all automotive and truck equipment used in the performance of the Services both on and off the Jobsite, and must include the loading and unloading of same.

**(d)** In the event Provider is furnishing design services or other professional services, Provider shall obtain Professional Liability or Errors & Omissions Insurance for the Services. Such insurance shall have a limit of $5,000,000 per claim. Coverage shall be maintained for a period of (3) years following final completion and acceptance of the Services specified in Scope of Work.

**(e)** Umbrella (Excess) Liability Coverage (follow form) in an amount not less than $6,000,000 per occurrence.

**(f)** If Provider has care, custody or control of Owner property or inventory, Provider shall be responsible for any loss or damage to it, and provide all risk Property Coverage at full replacement cost for same.

**9.3** **Acceptance of Insurance Certificate.** Acceptance of any insurance certificate by Owner shall not constitute acceptance of the adequacy of coverage, compliance with the requirements of this Agreement or any Project Supplement or serve as an amendment to this Agreement or any Project Supplement.

## 10. Records and Audits

**10.1** **Records.** Provider will maintain, in accordance with generally accepted accounting principles, complete and accurate records of all matters relating to Services that enable Provider to demonstrate compliance with its obligations under this Agreement and any Project Supplement, including, without limitation, time sheets, billing records, invoices, payment applications, payments of Consultants and receipts relating to

reimbursable expenses. Provider shall maintain such records for a period of six (6) years after the expiration or termination of this Agreement.

10.2 **Audits.** Owner or its representatives may audit such records of Provider at any time during the term of this Agreement and the six (6) year period following expiration or termination of this Agreement, during normal business hours and upon reasonable notice to Provider. Provider shall make such records readily available for such audit, and Owner or its representatives may copy any and all such records. If any such audit reveals that Provider has overcharged Owner, Provider shall promptly reimburse Owner for such overcharge, and in the event that any such overcharge equals an amount equal to or greater than five percent (5%) of the amount that should have been charged under the terms of this Agreement and the applicable Project Supplement, then Provider shall promptly reimburse Owner for all reasonable costs and expenses incurred in the conduct of the audit.

## 11. Term and Termination

11.1 **Term.** This Agreement shall commence on the Effective Date and shall remain in effect through March 31, 2007 (the "Initial Term") unless terminated earlier as provided in this Agreement. Owner may extend this Agreement beyond the Initial Term for up to three (3) successive one-year periods (each an "Extension Period") by providing written notice to Provider of such extension at least thirty (30) calendar days prior to the expiration of the Initial Term or the applicable Extension Period, as the case may be.

11.2 **Termination by Owner for Convenience.** Owner may terminate this Agreement and/or any and all Project Supplements at any time without cause and in its sole discretion immediately upon written notice to Provider. In the event of such termination of any Project Supplement by Owner for convenience, Owner shall pay Provider in accordance with the terms of this Agreement and the applicable Project Supplement for all Services performed in conformance with the terms of this Agreement and the applicable Project Supplement prior to the effective date of such termination. For clarity, Provider shall not be entitled to any special, indirect, incidental or consequential damages, including without limitation, contribution to lost profits or unabsorbed overhead, as a result of Owner's election to terminate pursuant to this Section.

11.3 **Termination for Cause.** Either Provider or Owner may terminate this Agreement and/or any and all Project Supplements for cause immediately upon written notice to the other party in the event that such other party fails to perform any material obligation, through no fault of the party initiating the termination, that remains uncured for thirty (30) calendar days following written notice to such party of the deficiency. In the event the material breach relates to this Agreement, then the non-breaching party may terminate this Agreement and any or all Project Supplements. In the event the material breach solely relates to a Project Supplement, then the non-breaching party may only terminate such Project Supplement. In the

- 12-

event of termination of any Project Supplement by Owner under this Section, Owner shall pay Provider in accordance with the terms of this Agreement and the applicable Project Supplement for all Services performed in conformance with the terms of this Agreement and the applicable Project Supplement prior to the effective date of such termination, less any damages incurred by Owner as a result of the cause of such termination; provided, however, that Owner shall not be required to make any further payments until Owner has had a reasonable opportunity to adequately assess the extent of such damages.

11.4    **Termination for Insolvency.**  In the event that either party (the "Insolvent Party"): (i) becomes insolvent, or institutes or has instituted against it a petition for bankruptcy or is adjudicated bankrupt; or (ii) executes a bill of sale, deed of trust, or a general assignment for the benefit of creditors; or (iii) is dissolved or transfers a substantial portion of its assets to a third party; or (iv) a receiver is appointed for the benefit of its creditors, or a receiver is appointed on account of insolvency; then the Insolvent Party shall immediately notify the other party of such event and such other party shall be entitled to: (a) terminate this Agreement and/or any or all Project Supplements for cause immediately upon written notice to the Insolvent Party; or (b) request that the Insolvent Party or its successor provide adequate assurances of continued and future performance in form and substance acceptable to such other party, which shall be provided by the Insolvent Party within ten (10) calendar days of such request, and the other party may terminate this Agreement and/or any or all Project Supplements for cause immediately upon written notice to the Insolvent Party in the event that the Insolvent Party fails to provide such assurances acceptable to the other party within such ten (10) day period.

11.5    **Effect of Termination.**  Any termination or expiration of this Agreement shall not terminate or effect the obligations of the Parties to each other under existing Project Supplements issued pursuant to this Agreement, and such Project Supplements shall continue in full force and effect and shall continue to be governed by the terms of this Agreement until their expiration or completion or until any such Project Supplements are themselves terminated pursuant to this Article.

11.6    **Obligations of Provider Upon Termination.**  Upon termination of this Agreement and/or any Project Supplements, Provider shall immediately (i) make such assignments of, and provide access to, contracts, licenses, permits, bills, computer data, and other documents, including any cost control system implemented by Provider, related to the performance of the Services; (ii) deliver all documents and materials developed by Provider in the performance of the Services, whether completed or in progress, including without limitation all books, records, plans, surveys, data, drawings and other documents and materials related to the Services; (iii) take such further action that Owner may reasonably request to minimize delay and expense arising from such termination; and (iv) cooperate in the transition to any new service provider(s) after the same is designated by

- 13 -

Owner. Provider acknowledges that its failure to comply with this provision will cause Owner irreparable harm.

11.7    **Suspension.** Owner may, by written notice to Provider, suspend all or any part of any Scope of Work at any stage of its progress and suspend Provider's engagement thereon. If any Scope of Work is suspended by Owner for a period of ninety (90) days or more, Provider may, at any time thereafter upon ten (10) calendar days written notice to Owner, terminate the affected Project Supplement, and Owner shall pay Provider in accordance with the terms of this Agreement and the applicable Project Supplement for all Services performed in conformance with the terms of this Agreement and the applicable Project Supplement prior to the effective date of such termination. For clarity, neither party shall be entitled to any special, indirect, incidental or consequential damages, including without limitation, contribution to lost profits or unabsorbed overhead, as a result of Provider's election to terminate pursuant to this Section.

11.8    **Survival of Obligations.** The termination or expiration of this Agreement shall not affect the survival and continuing validity of Articles 5 (Payments), 8 (Proprietary Rights), 9 (Insurance Requirements), 10 (Records and Audits), 11 (Term and Termination), 12 (Confidentiality), 13 (Indemnification), 15 (Liens) and 16 (Miscellaneous).

12.    **Confidentiality**

12.1    **Restricted Disclosure and Use of Confidential Information.** Provider shall keep, and Provider shall cause its Consultants to keep, strictly confidential and not disclose to any third party Confidential Information. Provider shall not use, and shall not permit its Consultants to use, the Confidential Information except in accordance with this Agreement. In the event Provider becomes aware of any breach of the confidentiality and non-use obligation contained in this Article by it or its Consultants, Provider shall promptly notify Owner of such breach.

12.2    **Permitted Disclosures.** Notwithstanding foregoing, Confidential Information may be disclosed by Provider to the extent required: (a) for the performance of Provider's Services; (b) in order to comply with professional standards of conduct to which Provider may be bound by law for preservation of the public safety, health, and welfare; and (c) in order to comply with any court order, statute or governmental directive. In the event that such court order, statute or governmental directive requires disclosure of Confidential Information, Provider shall provide prompt notice to Owner before such Confidential Information is disclosed and cooperate with Owner if Owner seeks protective order or other appropriate remedy for such Confidential Information, and if no such protective order or other remedy is obtained, Provider will furnish only that portion of the Confidential Information which it is advised by its counsel it is legally required to furnish.

12.3    **Precautions.** In order to comply with its confidentiality and non-use obligations, Provider shall take at least the following precautions: (a)

Provider shall exercise all reasonable efforts to prevent unauthorized employees and unauthorized third parties from gaining access to Confidential Information; (b) Provider shall disclose Confidential Information only to such of its Consultants and its and their employees who have a need to know such Confidential Information; provided, however, before any release of Confidential Information, Provider shall bind its Consultants and its and their employees receiving such Confidential Information to a written agreement of confidentiality at least as restrictive as this Agreement; and (c) prior to any disclosure, Provider shall instruct its Consultants and its and their employees of the confidential nature of, and to maintain the confidentiality of, the Confidential Information. Provider shall be responsible for all actions of its Consultants and its and their employees, including without limitation any breach of the terms hereof. Provider on behalf of itself, its Consultants and its and their respective employees warrants that no disclosures of any Confidential Information (including, without limitation, financial information) has been heretofore made which would have violated or which does violate this Agreement.

12.4   **Survival.** Upon the later of Owner's request or termination or expiration of this Agreement, Provider shall promptly return to Owner all of the Confidential Information. However, Provider may retain one copy of any written documents containing Confidential Information in its confidential files for the sole purpose of determining its continuing obligations under this Agreement. Notwithstanding Provider's return and destruction of the Confidential Information, Provider will continue to be bound by its obligation of confidentiality and non-use under this Agreement for a period of five (5) years after the termination or expiration of this Agreement.

12.5   **Remedies.** The Parties understand and agree that money damages may not be a sufficient remedy for any breach of this Article and that, in addition to any and all other remedies available at law or in equity, Owner may be entitled to seek equitable relief, including injunction and specific performance, as a remedy for any actual or threatened breach of this Article.

13.   **Indemnification**

13.1   **Indemnification.** Provider shall defend, indemnify, and hold harmless Owner, its Affiliates and its and their respective directors, officers, employees, agents and representatives from and against any and all losses, damages, settlements, costs, charges or other expenses or liabilities of every kind or character (including reasonable attorney's fees and costs), arising out of or relating to any and all claims, liabilities, liens, demands, obligations, actions, proceedings, or cause of action of every kind to the extent arising out of or related to:

(a)   failure of Provider or its Consultants or its or their employees to comply with any law, ordinance, regulation, rule or order of any governmental body, including but not limited to failure of Provider

- 15-

to pay taxes, duties, or fees, or to comply with employee safety regulations or with the Jobsite safety rules;

**(b)**    infringement or improper appropriation or use by Provider or its Consultants or its or their employees of trade secrets, proprietary information, know how, copyright or patented inventions;

**(c)**    breach by Provider or its Consultants or its or their employees of any agreements, covenants, warrantees, guarantees and representations contained in this Agreement and any Project Supplement, amendment, work orders and related documents;

**(d)**    Provider's failure to pay any of its Consultants;

**(e)**    injury to or death of any person or damage to property resulting from and/or caused in whole or part by the Provider's performance or non-performances of its obligations under this Agreement and any Project Supplement;

**(f)**    claims made by persons furnished by Provider or its Consultants (i) based on employment contract, or any laws prohibiting discrimination in employment, or (ii) under worker's compensation or similar laws; and

**(g)**    negligence, recklessness, willful misconduct, fraud or bad faith of Provider or its Consultants or its or their employees.

**13.2    Indemnification Procedures.**  Owner shall inform Provider of any claim for which it intends to invoke indemnification and, at Provider's request, reasonably cooperate with Provider in defending such claim.  Provider shall assume, at its cost and expense, the defense of such claim through its legal counsel selected and reasonably acceptable to Owner, except that Owner may at its option and expense select and be represented by separate counsel.  Provider shall have control over the suit or proceedings, including the right to settle; provided, however, Provider will not, absent the written consent of Owner, consent to the entry of any judgment or enter into any settlement that (1) provides for any relief other than the payment of monetary damages for which Provider shall be solely liable and (2) where the claimant or plaintiff does not release Owner, its Affiliates and its respective directors, officers, employees, agents and representatives, as the case may be, from all liability in respect thereof.  In no event shall Owner be liable for any claims that are compromised or settled in violation of this Section.

**14.    Limitation of Liability**

NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING WITHOUT LIMITATION, DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, INTERRUPTION OR LOSS OF BUSINESS, LOST GOODWILL, LOST

- 16 -

REVENUE AND LOST OPPORTUNITY) ARISING OUT OF ANY OF THE TERMS OR CONDITIONS OF THIS AGREEMENT OR WITH RESPECT TO ITS PERFORMANCE HEREUNDER. The foregoing limitation of liability and exclusion of damages applies even if a Party had or should have had knowledge, actual or constructive, of the possibility of such damages. The foregoing limitation of such liability and exclusion of damages are fundamental elements of the basis of the bargain between the Parties and this Agreement would not be entered into without such limitations and exclusions. The foregoing limitation of liability and exclusion of damages shall apply whether a claim is based on breach of contract, breach of warranty, tort (including negligence), product liability, strict liability or otherwise, and notwithstanding any failure of essential purpose of any limited remedy herein. Notwithstanding the foregoing, Provider shall be liable to Owner for special, indirect, incidental or consequential damages to the extent (i) arising out a breach of the non-disclosure and non-use obligations herein, (ii) arising out of Provider's obligations to indemnify for third party claims, (iii) made for bodily injury, death or damage to real or personal property, (iv) covered by any errors or omissions insurance carried by Provider or its Consultants, or (v) resulting from Provider's gross negligence or willful misconduct.

15.    **Liens**

To the extent permitted by law, Provider, for itself and all of it Consultants and all of its and their respective laborers, mechanics and materialmen, hereby waives and agrees not to claim any lien against the Scope of Work or Work Product, but shall rely solely upon the general credit of Owner.

16.    **Miscellaneous**

16.1    **Notices.** Any notice required to be given hereunder shall be in writing and deemed to have been sufficiently given, (i) when delivered in person, (ii) on the fifth business day after mailing by registered or certified mail, postage prepaid, return receipt requested, or (iii) on the next business day after mailing by overnight courier service, to the addresses specified below:

If to Owner:

Owner Business Contact:     Pfizer Inc.,
                            7000 Portage Road
                            Kalamazoo, MI 49001

Attn:                       Arturo Robles
                            Internal Routing: 041-007
                            Fax: 269-833-9131

If to Provider:

Provider Business Contact     CRB Consulting Engineers
                              11701 Borman Drive, Ste. 175
                              St. Louis, MO  63146

Attn:                         Tim Greenwald

Provider or Owner may, by notice to the other, change the addresses and names given above.

16.2     **Governing Law, Waiver of Jury Trial and Dispute Resolution.**

   (a).     **Negotiations of Dispute**

With respect to any controversy, claim, counterclaim, dispute, difference or misunderstanding arising out of or relating to the interpretation or application of any term or provisions of this Agreement or a Project Supplement or any related documents, a Party shall provide written notice to the other Party of the existence of such dispute. The Parties shall for a period of thirty (30) days following such notice, enter into good faith discussions and negotiations in an attempt to resolve such dispute. If, by the end of such thirty (30) day period, unless such period is extended by mutual agreement of Parties, if the Parties have been unable to resolve such dispute, either Party may initiate litigation. The procedures specified in this Section shall be the sole and exclusive procedures for the resolution of disputes between the Parties arising out of or relating to this Agreement and any Project Supplement; provided, however, that a Party may seek a preliminary injunction or other preliminary judicial relief if in its judgment such action is necessary to avoid irreparable harm.

   (b).     **Governing Law**

The validity, interpretation and performance of this Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to the principles of conflicts of law. All actions and proceedings under this Agreement shall be brought exclusively in a state or federal court of competent subject matter jurisdiction in the Borough of Manhattan, New York City, State of New York. The Parties hereby waive (i) any objection which it may have at any time to the venue of the proceedings in any such court, (ii) any claim that such proceedings have been brought in an inconvenient forum and (iii) the right to object, with respect to such proceedings, that such court does not have any jurisdiction over such Party.

- 18-

(c).    **Waiver of Jury Trial**

In any controversy or claim, whether based in contract, tort or other legal theory, arising out of or relating to this Agreement, Project Supplements or any related documents, their negotiation, enforceability or validity, or the performance or breach thereof or the relationships established thereunder, all Parties hereby waive their right to trial by jury.

(d).    **Continuing Work during Dispute**

Pending resolution of any dispute under this Agreement or any Project Supplement by settlement or by final judgment, Provider shall proceed diligently with its performance in accordance with this Agreement and the applicable Project Supplement, and maintain the project schedule during any dispute proceedings unless otherwise instructed by Owner.

16.3    **Headings.** Headings of sections or other parts of this Agreement and Project Supplements are included herein for convenience of reference only, and shall not constitute a part of this Agreement and Project Supplements or change the meaning of this Agreement and Project Supplements, as the case may be.

16.4    **Entire Agreement.** This Agreement, together with any Project Supplement, amendments, work orders or other related documents, constitutes the entire agreement of the Parties with respect to its subject matter and merges and supersedes all prior discussions and writings with respect thereto; provided, however, the terms of this Agreement and the applicable Project Supplement shall be controlling over any terms of any purchase order, sales acknowledgement, invoice or other related documents.

16.5    **No Waiver.** A waiver by a Party of any term or condition of this Agreement or Project Supplement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof.

16.6    **Severability.** If and to the extent that any court or tribunal of competent jurisdiction holds any provision of this Agreement or any Project Supplement to be unenforceable in a final non-appealable order, such unenforceable provision shall be stricken and the remainder of this Agreement shall not be affected thereby. Owner and Provider shall in good faith attempt to replace any unenforceable provision of this Agreement or the Project Supplement with a provision that is enforceable and that comes as close as possible to expressing the intention of the original provision.

16.7    **Binding Effect.** This Agreement shall apply to, inure to the benefit of and be binding upon the Parties hereto and upon their respective successors and permitted assigns. The Parties agree that this Agreement is not intended by any Party to give any benefits, rights, privileges, actions or remedies to any person or entity, partnership, firm or corporation as a third party beneficiary or otherwise under any theory of law.

16.8    **Subcontracting and Assignment.**

   **(a).**    In the event Owner approves Provider's use of a Consultant, Provider shall ensure that such Consultant shall be subject to, and perform its Services, in accordance with the terms of this Agreement and the applicable Project Supplement.

   **(b).**    Provider shall not assign any of its rights or delegate or subcontract any of its duties under this Agreement without the prior written consent of Owner which may be withheld at its discretion. Any such attempted assignment of rights or delegation or subcontracting of duties without the prior written consent of Owner shall be void and ineffective. Any such assignment, delegation or subcontracting consented to by Owner shall not relieve Provider of its responsibilities and liabilities hereunder and Provider shall remain liable to Owner for the conduct and performance of each permitted assignee, delegate and subcontractor hereunder.

16.9    **Amendments.** No modification, alteration of this Agreement or any Project Supplement, amendments, work orders or other related documents shall be binding upon the Parties unless contained in a writing signed by a duly authorized agent for each respective Party and specifically referring hereto or thereto.

16.10    **Force Majeure.** No Party shall be liable for any failure to perform or any delays in performance, and no Party shall be deemed to be in breach or default of its obligations set forth in this Agreement and any Project Supplements, if, to the extent, and for as long as such failure or delay is due to any causes that are beyond its reasonable control and not to its acts or omissions, including, without limitation, such causes as acts of God, fire, flood, severe storm, earthquake, civil disturbance, lockout, riot, order of any court or administrative body, embargo, acts of government, war (whether or not declared), acts of terrorism, or other similar causes ("Force Majeure Event"). For clarity, labor disputes shall not be deemed a Force Majeur Event. In the event of a Force Majeure Event, the Party prevented from or delayed in performing shall promptly give notice to the other Party and shall use commercially reasonable efforts to avoid or minimize the delay. The Party affected by the other Party's delay may elect to: (a) suspend performance and extend the time for performance for the duration of the Force Majeure Event, or (b) cancel all or any part of the unperformed part of this Agreement or any applicable Project Supplement.

16.11 **Independent Contractor.** Provider shall perform the Services as an independent contractor with exclusive control of the manner and means of performing the Scope of Work in accordance with the requirements of this Agreement and the Project Supplement. Provider has no authority to act or make any agreements or representations on behalf of the Owner or its Affiliates. This Agreement or Project Supplement is not intended to create, and shall not be construed as creating, between Owner and Provider, the relationship of principal and agent, joint venturers, co-partners or any other such relationship, the existence of which is hereby expressly denied. No employee, or agent engaged by Provider shall be, or shall be deemed to be, an employee or agent of Owner or its Affiliate and shall not be entitled to any benefits that the Owner or its Affiliate provides to its own employees.

16.12 **Rule of Construction.** The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event that an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

16.13 **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, and all of which shall together constitute one and the same agreement.

16.14 **No Publicity.** Provider shall not, and shall cause its Consultants and its and their employees to not, make any representations relating to name, trademark and logo of Owner or the Scope of Work, including without limitation the terms of this Agreement and the Project Supplement, whether oral, photographic, pictorial, graphic, artistic, electronic or otherwise, without Owner's prior written consent in each instance. In addition, Provider shall not, and shall cause its Consultants and its and their employees to not, publicize the name, trademark, logo of the Owner or the Scope of Work, the subject matter of this Agreement or Project Supplement, or any design information given to or provided by Provider or its Consultants in connection with a Scope of Work nor shall Provider or its Consultants engage in any press release, publication, advertising or other public disclosure regarding a Scope of Work without first consulting with and obtaining Owner's prior written consent in each instance.

16.15 If specified in the applicable Project Supplement time will be of the essence. Time is of the essence in the performance of the Services. Provider shall make whatever adjustments, including without limitation working hours, manpower and equipment, deemed necessary to complete the Services in accordance with the schedule specified in the applicable Project Supplement.

In WITNESS WHEREOF, Provider and Owner have caused this Agreement to be duly executed and delivered as of the date first written above.

CRB Consulting Engineers Inc.,                PGM, Kalamazoo & Holland, MI

By: _____              By: _____

Name: Jeffery A. Biskup                      Name: Antoon Brusselmans

Title: Principal                             Title: Site Leader, PGM Kalamazoo

Date: March 24, 2004                         Date: 3/31/04

                                             By: _____

                                             Name: William Freckman

                                             Title: Site Leader, PGM Holland

                                             Date: 4/23/04